## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Michelle Pohlen,                                   Court File No.: 22-cv-2185 (PAM/LIB)

        Plaintiff,

v.

Alejandro N. Mayorkas,                    **AMENDED COMPLAINT AND**
Secretary, United States Department of    **JURY DEMAND**
Homeland Security,

        Defendant.

---

COMES NOW Plaintiff, Michelle Pohlen, by her undersigned counsel, for her Complaint against Alejandro N. Mayorkas, Secretary, United States Department of Homeland Security, and respectfully states and alleges, to the best of her knowledge, information and belief, the following:

### INTRODUCTION

1.    From a young age, Plaintiff Michelle Pohlen dreamed of pursuing a career in law enforcement.

2.    Plaintiff's dream became reality in March 2019 when she received an offer of employment to the position of Criminal Investigator with Defendant United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") division.

3.    What began as a dream tragically turned out to be a long-running nightmare, owing to a pattern of gender-based discrimination, harassment and retaliation on Defendant's part following her return to work after being sexually assaulted by a co-worker in the

1

afterhours of a work conference.

4.      So extreme was Plaintiff's harassment that, at one point, she came close to taking her own life. Thankfully, she pulled herself back from the brink of suicide.

5.      However, the psychological trauma of her assault, exacerbated by ongoing retaliation and harassment, necessitated Plaintiff going out on mental health-related leave under the Family Medical Leave Act ("FMLA").

6.      Upon her return, Plaintiff found herself ostracized and effectively demoted, forced to do strictly paperwork activities despite being medically cleared to resume the full activities of her position as Criminal Investigator.

7.      In an apparent effort to force Plaintiff's resignation, Defendant rejected each of her eminently reasonable requests for an accommodation of her disabilities.

8.      One denied request was permission to work remotely from her Twin Cities support base of family and friends, rather than Rapid City. This despite the fact that Plaintiff was barred from coming into the office, hadn't done so for nearly five months and her work at that point was 100% remote.

9.      Frustrated, Plaintiff filed a report of discrimination and retaliation to Defendant's EEO office in December 2021. Taking the expression "justice delayed is justice denied" to a new level, that office had yet to complete its investigation even as of the date of the initial filing of the original Complaint in this matter on September 8, 2022, some eight months later.

10.     Unsuccessful in forcing Plaintiff's resignation by making her employment intolerable, Defendant began the removal process to fire her in late January 2022 for the

professed, but false reason that she is medically unable to perform her job duties.

11.     Defendant ultimately terminated Plaintiff's employment effective October 2022.

12.     Based on the foregoing and as more fully alleged herein, Plaintiff brings this action for unlawful gender discrimination and retaliation in violation of Title VII of the Equal Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. and disability discrimination and failure to accommodate under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701, *et seq*.

## PARTIES

13.     Plaintiff Michelle Pohlen is a 32-year old female resident of Wisconsin.

14.     Defendant is the Secretary of the DHS. He is being sued here in his official capacity as the head of the DHS, which was at all relevant times hereto, and still is, an agency of the federal government and was at all relevant times Plaintiff's employer.

## JURISDICTION AND VENUE

15.     Jurisdiction of this action is conferred upon this Court as this case involves Federal Questions under Title VII and the Rehabilitation Act. The Court also has jurisdiction pursuant to 29 U.S.C. §2617 and 28 U.S.C. §1331.

16.     Venue in this judicial district is proper on the basis of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within it.

17.     All of the necessary administrative prerequisites have been met prior to filing the instant action, as Plaintiff has filed timely complaints of discrimination and retaliation

with the Equal Employment Opportunity ("EEO") office of her federal employer, the DHS,

and brings this claim more than 180 days after she filed her complaints.

## FACTS

18.    Growing up, Plaintiff always held law enforcement and the military

professionals in high esteem, her father and sister having both served. By entering the law

enforcement profession, she hoped to effect positive change, acting as a role model and

helping alter the public's frequently negative attitude towards police officers.

19.    To effectuate this career goal, Plaintiff obtained relevant experience by service

in the Minnesota Air National Guard and employment first as a law enforcement officer with

the Savannah Chatham Metropolitan Police Department and then as an Air Marshall for

Defendant.

20.    In early March 2019, Plaintiff learned of and applied to the open position of

Criminal Investigator in Defendant's ICE division.

21.    In response to her application, Plaintiff received a written offer of employment

on or about March 17, 2019 which she right away accepted, eager to begin a new chapter in

her life and career.

22.    From the outset and for the entire duration of her employment with Defendant,

Plaintiff was stationed at its Rapid City, South Dakota field office, far away from her loved

ones and the house she owned in the Minneapolis-St. Paul area. Plaintiff was willing to accept

these short term sacrifices because the position fulfilled her life-long dream.

23.    From the outset of her employment, Plaintiff distinguished herself in the

performance of her job duties through hard work, skill and dedication. In addition to being

an exemplary employee, Plaintiff was a consummate "team player," well-liked by her peers. In short, she had every reason to think she would have a long and rewarding career at DHS.

24.    Unfortunately, this was not to be. Around March 4, 2020, while attending a two-week conference in Fairfax, Virginia on the topic of child exploitation, Plaintiff was sexually assaulted in a hotel room by a fellow DHS employee.

25.    Shattered, Plaintiff returned to Rapid City on March 16, 2020 and promptly reported what had taken place to her supervisor, Resident Agent in Charge Nicholas Saroff, as well as a co-worker, Amber Cooper.

26.    Displaying no compassion or sympathy, Mr. Saroff did little to facilitate Plaintiff's return to work. The most he did was to give Plaintiff a phone number so she could speak with a counselor at the Employee Assistance Program.

27.    To the contrary, he viewed her frail emotional state as a sign of weakness, at least as perceived by Plaintiff. His callous lack of sensitivity for what Plaintiff had gone through was a continuous feature from that point onward.

28.    Almost immediately after resuming her job duties as a criminal investigator, Plaintiff began to suffer from panic attacks during work hours associated with her sexual assault. These took place not fewer than 20 times between March 2020 and March 2021.

29.    Triggering events causing these attacks included disagreements with Mr. Saroff and viewing images of child pornography, required on occasion in the course of her job duties as a criminal investigator.

30.    During such moments, Plaintiff would experience chest pain, difficulty breathing and an inability to think clearly.

31.    To help alleviate these symptoms, Plaintiff sometimes left the work premises or went to the gym to work out.

32.    Around June 2020, Plaintiff's condition, which she later learned to be Post-Traumatic Stress Disorder ("PTSD"), combined with her mistreatment by Mr. Saroff, led to a verbal altercation between the two, in the course of which Plaintiff told Mr. Saroff she needed to go home for mental health reasons. Mr. Saroff denied the request, stating that her doing so would constitute job abandonment with consequences to follow.

33.    Shocked by this response, Plaintiff went home in tears anyway, placing her health and well-being over career. Once there, Plaintiff requested sick leave from Human Resources, which request was granted.

34.    Mr. Saroff's indifference to Plaintiff's suffering and, at times, open hostility exacerbated Plaintiff's significant mental health symptoms over the ensuing months, delaying her recovery.

35.    Around July 2020, Plaintiff requested time off from work to receive much needed mental health treatment. In order to obtain the necessary approvals, Plaintiff was required to disclose to Mr. Saroff that she was taking prescription medication as proof she was suffering from mental health issues.

36.    Consistent with his prior threat, Mr. Saroff expressed to Plaintiff during this time frame his disapproval of employees taking mental health days, even though doing so is an approved use of leave. Her clear impression was that Mr. Saroff did not believe mental health problems are a legitimate disability, but instead a sign of weakness. Only after Plaintiff disclosed that she was taking medication did Mr. Saroff relent and condone her use of sick

leave to deal with her panic attacks or attend counseling sessions.

37.    On January 8, 2021, Plaintiff informed Mr. Saroff that she had been exposed to a person infected with the COVID-19 virus. To protect her health and that of her co-workers, Plaintiff requested permission to leave the office. Mr. Saroff responded with a brusque "Grow up," without providing a yes or no response. He then left the office and remained out of contact for two hours.

38.    Frustrated and concerned, Plaintiff emailed Mr. Saroff at 10:18 a.m., stating that she would be leaving the office. Having received no response, she texted him at 11:47 a.m. Soon afterwards, Plaintiff received a group email indicating that the office was being closed, and everyone was to go home on account of a direct COVID exposure.

39.    On January 19, 2021, Plaintiff and Mr. Saroff had a heated exchange, in which both participants used profanity. Their dispute at this time centered on the office's (non)response to the COVID-19 outbreak. During the argument, Plaintiff became extremely upset after Mr. Saroff made a belittling accusation in which he told her that she is an office employee at highest risk because of her then spouse's occupation as a nurse. In response, Plaintiff informed Mr. Saroff the opposite was true, on account of her spouse's required use of PPE at all times while performing nursing duties.

40.    As a testament to Plaintiff's extremely fragile emotional state, resulting from her sexual assault (a fact known to Mr. Saroff), Plaintiff went so far as to tell Mr. Saroff at the time that she hopes to get COVID and die.

41.    As a result of this confrontation, Plaintiff was subject to a written counseling notice on February 9, 2021. Mr. Saroff, for his part in the dispute, was neither counseled nor

disciplined. After receiving the document, Plaintiff asked Mr. Saroff if she could tell upper management her side of the story.

42.    Mr. Saroff responded by saying "I highly discourage that." Plaintiff processed his statement as more a threat than advice, given her subordinate status and prior, ongoing hostile and insensitive treatment by Mr. Saroff. Fearing for her job, Plaintiff made no formal protest to the discipline.

43.    On February 10, 2021, Plaintiff requested the workplace accommodation of teleworking from Minnesota in order to alleviate her ongoing mental health problems. In her request, Plaintiff mentioned that her sister lives nearby in Wisconsin, but if required to be closer to work would obtain temporary lodging in Minnesota, closer to the office. Plaintiff asked, in the alternative, for a temporary hardship transfer.

44.    Despite the fact that the Rapid City office was under a COVID-related telework order at that time, both requests were denied.

45.    On March 11, 2021, Plaintiff telephoned Mr. Saroff and disclosed to him that she came close to committing suicide the night before on account of the way he was treating her in the workplace. Although spared her life, Plaintiff's career in law enforcement that evening was effectively ruined as a result of Defendant's ensuing retaliation.

46.    Four hours later, two agents from her office came to Plaintiff's apartment and seized her badge, duty weapon and personal weapons. The next week, she was notified via text that she must turn in for "inventory" her building keys, Homeland Security Investigations raid jackets and other agency issued equipment.

47.    On March 19, 2021, Plaintiff made a formal Rehabilitation Act Section 501

accommodation request for reassignment from Rapid City to St. Paul, Minnesota. Many months elapsed before a decision was made on her request.

48.    Plaintiff thereafter applied for and was granted FMLA leave to attend a thirty-day residential mental health treatment program in Salt Lake City, Utah.

49.    Upon her return to Rapid City, Plaintiff requested but was denied access to her government issued cellphone, which contrary to her service weapon, was not an instrument with which Plaintiff could cause harm to herself or other individuals. She was given no reason for this denial, which she interpreted to be an additional form of retaliation.

50.    As further acts of retaliation, Defendant refused Plaintiff's request for phone numbers for human resources or access to her work email.

51.    Plaintiff then reached out via telephone and text to no fewer than six fellow workers, Amber Cooper, Robert Espinoza, Jared Bihr, Tonya Price, Michael Evans and even Mr. Saroff himself. None responded, other than Ms. Cooper, who in a text to Plaintiff's spouse, explained that she had been instructed not to speak to Plaintiff. Plaintiff came to learn that all employees were instructed to cease communication with her due to an "investigation." This investigation, upon information and belief, was Plaintiff's own report of sexual assault.

52.    On May 12, 2021, Plaintiff submitted to Mr. Saroff a letter from her psychiatrist clearing her to return to work as a law enforcement officer.

53.    Instead, Plaintiff returned from FMLA leave on May 17, 2021 only to learn of her immediate reassignment to low level, administrative duties, requiring she work remotely from home via telework. Plaintiff was prohibited from coming to the office to retrieve her personal effects, which instead were delivered, at Mr. Saroff's request, to her by two co-

workers.

54.     The basis for Plaintiff's reassignment was explained to her in an email from

Dr. McMillan from ICE medical: "I recommend you first return to the workplace on admin

duties so [Mr. Saroff], and coworkers, can see you've recovered and are no longer a threat to

yourself or others. Once they are comfortable with you, then we can return you to a full-duty

status."

55.     From that date to the end of her employment, Defendant rejected Plaintiff's

ongoing requests to return to active duty as a criminal investigator. Plaintiff was barred from

carrying her duty weapon and wearing a badge. Plaintiff's exclusion from the force, on top

of causing added emotional distress, made it impossible for her to find a job with any state or

local law enforcement agencies that might otherwise hire her.

56.     On August 2, 2021, Plaintiff renewed her still-pending request for a reasonable

accommodation made months before in March 2021, emailing Mr. Saroff as follows:

> Can you please inquire from the SAC office if I can remain on my
> administrative status in Minnesota instead of Rapid City as of
> September 1st? I have been in Rapid City this entire time even after
> an interim relocation to MN was approved. I am not completing any
> duties for the Rapid City Office. I have no support in Rapid City and
> I would like to be near my family. I understand that my transfer
> request is still pending. I am just asking to be in MN until a final
> determination is made.

57. On September 28, 2021, Plaintiff was required to submit to a polygraph test.

by Defendant's Office of Professional Responsibility ("OPR") as part of the sexual assault

investigation, during the course of which she was accused of lying about remembering details

of her assault.

58.     On October 11, 2021 and October 27, 2021, Plaintiff underwent an

Independent Medical Examination ("IME") to determine her fitness for duty to return to work as a criminal investigator. The examination was conducted by Clay Paulis, MD, via telehealth (Zoom) at Midwest Wellness Institute.

59.    This resulted in a formal finding that Plaintiff was fit to return to her prior role of criminal investigator, so long as she was exempted from duties involving investigation of sexual exploitation crimes involving minors, that triggered Plaintiff's diagnosed PTSD.

60.    It was not until December 7, 2021, that Plaintiff received final word on her accommodation request. Once again, it was rejected. The stated rationale for this decision was that Defendant "must have a Criminal Investigator workforce that can perform duties relating to all the crimes the Agency is charged with investigating."

61.    Plaintiff responded to the letter by an email, in which she clarified that she in fact had no mental-health related objection to investigating sexual exploitation crimes.

62.    Rather, Plaintiff's accommodation request was more limited, to be exempted from viewing images of child exploitation.

63.    In responding to the email, Special Agent Goldberg seized upon an alleged "inconsistency" with the IME report, which more broadly referred to relief from investigating "minor sexual exploitation crimes." On this alleged basis, he stated, "I still have questions regarding your fitness for duty," indicating a need to discuss the matter further with Employee Relations and legal counsel.

64.    Having exhausted all efforts to obtain workplace accommodations, Plaintiff filed a Complaint of Employment Discrimination on January 12, 2022 with Defendant's EEO office. Remarkably, up through July 11, 2022, the government's investigation had remained

11

uncompleted.

65.    On January 27, 2022, Plaintiff received a Proposal to Remove, signaling the start of the process to terminate her employment. The letter indicated removal was non-disciplinary and based on her purported "inability to perform the full functions of your job," specifically referencing the IME report's supposed finding that Plaintiff was "able to return to duty so long as [she was] not assigned to an area investigating sex crimes."

66.    A Fitness for Duty Evaluation, attached to the Proposal to Remove as justification the proposed action, indicates to the contrary a recommendation that Plaintiff "not be assigned to an area investigating sexual crimes such as child exploitation in the future."

67.    The Proposal to Remove acknowledges that Plaintiff could be granted a "limited exception" to be relieved from investigating sex crimes involving minors as an accommodation but indicates that it would be unreasonable to extend that extension to all sex crimes, *i.e.* ones involving adult suspects.

68.    Plaintiff never requested to be exempted from investigations of all sex crimes, even ones involving minors, so long as she was relieved of the obligation to view images of child pornography.

69.    The same day she received the Proposal to Remove, Plaintiff requested the reasonable accommodation of a transfer another position within DHS. Similar to all of her prior accommodation requests, this request came to nothing.

70.    From that date forward through the date of her ultimate termination, Plaintiff worked full time in Rapid City from home assisting with the paperwork part of criminal

investigations. In doing so she was prohibited from coming into the office, and never once over these months has been requested to go into the office for any reason other than to sign paperwork or pick up a hard drive for analysis. Her teleworking could have been accomplished just as easily from Minnesota, but her accommodation request to do so remained denied.

71.    The strains of Plaintiff's isolation led to a divorce from her spouse in Minnesota, and exacerbated her ongoing, work-related emotional distress, for which she continues to seek medical care to the present day.

72.    On February 4, 2022, Plaintiff emailed Patricia Mulhall, the ICE EEO officer assigned to Plaintiff's EEO Complaint, to inform her that Plaintiff had received a 30-day notice for removal from federal service. (Removal is a term used by the federal government for termination of employment.)

73.    Ms. Mulhall by responsive email later that day confirmed receipt of the same.

74.    On April 11, 2022, legal counsel for Plaintiff received a correspondence from Defendant's Office of Diversity and Civil Rights setting forth a Statement of Claims Accepted for Investigation as follows: "Whether Complainant was subjected to ongoing harassment (non-sexual) leading to hostile work environment based on sex (Female), disability (Actual) and reprisal (Opposition) when the following incidents occurred: [***]"

75.    The last of the 13 incidents listed in Ms. Mulhall's April 11, 2022 letter reads as follows: "On January 25, 2022, the Acting Deputy SAC served Complainant with a proposed removal."

76.    The letter concludes by advising Plaintiff of her legal rights, included amongst

13

which was her right to file a civil action in U.S. District Court after 180 days have elapsed from Plaintiff's January 12, 2022 filing of her discrimination complaint.

77.    With respect to the prior investigation, on December 23, 2021, EEO Investigator Sarah Gerhart called Plaintiff and offered reinstating her annual and sick leave that had been expended following her sexual assault on the condition that she drop all of her claims.

78.    Plaintiff thereafter learned that she herself was the subject of a suspiciously timed investigation by the OPR for a "hostile work environment" and "conduct unbecoming of an ICE employee."

79.    On September 13, 2022, Plaintiff initiated the instant action.

80.    On September 29, 2022, Plaintiff received written notification from Defendant informing her of its Decision to Remove from Federal Service (Non-Disciplinary) terminating her employment as Criminal Investigator to be effective October 7, 2022.

81.    Defendant failed to copy Plaintiff's legal counsel on the September 29, 2022 letter or inform Plaintiff's legal counsel by any other means of the decision and any legal rights that Plaintiff has concerning filing a charge of discrimination with Defendant's EEO office, despite Defendant's knowledge that Plaintiff was a represented party who, in fact, had at that point initiated the instant lawsuit against it.

82.    The September 29. 2022 letter indicates Defendant's decision to remove Plaintiff was based upon the identical evidence and reasons as set forth in Defendant's January 27, 2022 Proposal to Remove.

83.    A subsequently received Notice of Personal Action lists the reason for removal

as "medical inability to perform duties."

84.    Plaintiff's removal from her position with Defendant was reasonably related to and arose out of the same facts alleged in Plaintiff's complaint of discrimination filed with Defendant's EEO office on January 12, 2022.

## CAUSES OF ACTION

### COUNT I
### GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

85.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint.

86.    Title VII prohibits discrimination in employment on the basis of gender, providing in relevant part:

> It shall be unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S. Code § 2000e–2(a)(1).

87.    Plaintiff and Defendant were employee and employer respectively for the purposes of Title VII.

88.    Defendant engaged in unlawful employment practices prohibited under Title VII by discriminating against Plaintiff on account of her sex/gender.

89.    Defendant additionally engaged in unlawful employment practices by exposing Plaintiff to a hostile work environment that was severe or pervasive and altered the terms and conditions of her employment based on her sex.

90.    Plaintiff has exhausted her administrative remedies by timely filing with the

EEO Office of ICE.

91.    As a direct and proximate result of Defendant's actions in violation Title VII,

Plaintiff has suffered the loss of past and future income, mental anguish, emotional distress,

loss of benefits, and other damages in an amount in excess of $75,000.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

92.    Plaintiff repeats and re-alleges each and every allegation made in the above

paragraphs of this Complaint.

93.    Title VII prohibits an employer from retaliating against an employee based on

her engagement in statutorily protected conduct, providing that it shall be unlawful

employment practice for an employer:

> to . . . discriminate against any of his employees . . . because [s]he
> has opposed any practice made an unlawful employment practice by
> this subchapter, or because [s]he has made a charge, testified, assisted
> or participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C. §2000e-3(a)(1).

94.    Plaintiff and Defendant were employee and employer respectively for the

purposes of Title VII.

95.    Plaintiff engaged in protected activity under Title VII by opposing

discrimination and/or participating in an anti-discrimination proceeding by filing and pursing

an EEO complaint of discrimination based on her gender and for alleged retaliation, as

specifically alleged herein.

96.    Defendant's adverse actions against Plaintiff following Plaintiff engaging in

protected activity constitute unlawful retaliation against Plaintiff under the anti-retaliation

16

provisions of Title VII.

97.     Plaintiff has exhausted her administrative remedies by timely filing with the EEO Office of ICE.

98.     Because ICE failed to complete an investigation of her complaints within 180 days time frame set forth under 29 C.F.R. § 1614.108, she is authorized to commence this civil action which she did by timely serving her Summons and Complaint in the instant matter.

99.     As a direct and proximate result of Defendant's actions in violation Title VII's anti-retaliation provisions, Plaintiff has suffered the loss of past and future income, mental anguish, emotional distress, loss of benefits, and other damages in an amount in excess of $75,000.

## COUNT III
## DISABILITY DISCRIMINATION IN VIOLATION OF
## THE REHABILITATION ACT

100.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint.

101.    The Rehabilitation Act prohibits discrimination against employees of the Federal Government on the basis of disability, providing in relevant part:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

42 U.S.C. § 12112(a).

102.    The term "discriminate against a qualified individual on the basis of disability"

includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an [...] employee." 42 U.S.C. § 12112 (b)(5)(A).

103.   Plaintiff and Defendant were employee and employer respectively for the purposes of the Rehabilitation Act.

104.   Plaintiff has a disability within the meaning of 42 U.S.C. § 12102.

105.   Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8).

106.   By its conduct, Defendant violated the Rehabilitation Act by discriminating against Plaintiff on the basis of her disability and by failing to provide a reasonable accommodation for her disability.

107.   Plaintiff has exhausted her administrative remedies by timely filing with the EEO Office of ICE.

108.   Because Defendant failed to complete an investigation of her complaints within 180 days' time frame set forth under 29 C.F.R. § 1614.108, she is authorized to commence this civil action which she did by timely serving her Summons and Complaint in the instant matter.

109.   As a direct result of Defendant's conduct, Plaintiff has suffered the loss of past and future income, mental anguish, emotional distress, loss of benefits, and other damages in an amount in excess of $75,000.

**COUNT IV**
**RETALIATION IN VIOLATION OF THE**
**REHABILITATION ACT**

110.   By reference hereto, Plaintiff incorporates the above-referenced paragraphs.

111.    The Rehabilitation Act prohibits retaliation against a "qualified handicapped person" for the purpose of interfering with the statutory rights afforded such individual. 28 C.F.R. § 42.503(b)(vii). *See also Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243 (11th Cir. 2011) (citing *Sutton v. Lader*, 185 F.3d 1203, 1207 n. 5 (11th Cir.1999)) (Rehabilitation Act incorporates the Americans with Disabilities Act's anti-retaliation provisions).

112.    By its conduct, Defendant violated the Rehabilitation Act by retaliating against Plaintiff for opposing discrimination by Defendant against Plaintiff on the basis of her disability and/or participating in an anti-discrimination proceeding, including filing of a charge of discrimination with Defendant's EEO office.

113.    Plaintiff has exhausted her administrative remedies by timely filing with the EEO Office of ICE.

114.  Because Defendant failed to complete an investigation of her complaints within 180 days time frame set forth under 29 C.F.R. § 1614.108, she is authorized to commence this civil action which she did by timely serving her Summons and Complaint in the instant matter.

115.    As a direct result of Defendant's conduct, Plaintiff has suffered the loss of past and future income, mental anguish, emotional distress, loss of benefits, and other damages in an amount in excess of $75,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for judgment against Defendant for the following relief:

A.     That the practices of Defendant complained of herein be adjudged, decreed, and declared to be violations of the rights secured to Plaintiff;

B.     That Defendant be required to make Plaintiff whole for its adverse, discriminatory, retaliatory, and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor;

C.     That Plaintiff be awarded front pay and the monetary value of any employment benefits she would have been entitled to in her position at Defendant;

D.     That a permanent prohibitory injunction be issued prohibiting Defendant from engaging in the practices complained of herein this Complaint;

E.     That Plaintiff be awarded compensatory damages, including loss of past and future income, emotional distress, loss of reputation, and related damages in an amount to be established at trial;

F.     That the Court award Plaintiff her reasonable attorneys' fees, costs, and disbursements pursuant to applicable law; and

G.     That the Court grant such other and further relief as it deems fair and equitable.

**Plaintiff demands her trial by jury on all counts where available.**

Dated: June 20, 2023                     **HALUNEN LAW**
                                         */s/ Charles A. Horowitz*
                                         Brent P. Benrud, #253194
                                         Charles A. Horowitz, #0294767
                                         1650 IDS Center
                                         80 South Eighth Street
                                         Minneapolis, MN  55402
                                         Telephone: (612) 605-4098
                                         Facsimile: (612) 605-4099
                                         benrud@halunenlaw.com
                                         horowitz@halunenlaw.com

*ATTORNEYS FOR PLAINTIFF*